

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00192-CV

———————————————

MUSTANG PARK OWNERS ASSOCIATION, INC. AND LEGACY SOUTHWEST
PROPERTY MANAGEMENT, LLC, Appellants

V.

CHRISTOPHER LUMLEY, Appellee

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 20-7230-16

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

This appeal concerns whether a homeowners' association with a contractual duty to "maintain" a subdivision common area's drainage facilities is liable under the subdivision's Declaration of Covenants, Conditions, and Restrictions (Declaration) for water damage to a subdivision homeowner's lot caused by water flowing from those common-area drainage facilities. The trial court held that Appellants Mustang Park Owners Association, Inc. (the Association) and its property manager Legacy Southwest Property Management, LLC were liable under the Declaration and awarded Appellee Christopher Lumley (1) specific performance and damages, (2) a declaratory judgment, and (3) attorney's fees. Because we hold that (1) the evidence does not show that Legacy was liable under the Declaration, (2) the evidence is insufficient to support the trial court's entire damages award and all of the specific-performance relief, and (3) only part of the declaratory relief was proper, we reverse and vacate the judgment in part and suggest a remittitur. Regardless of whether Lumley accepts our suggestion of remittitur, we will remand this case to the trial court to recalculate attorney's fees.

## I. Factual and Procedural Background

### A. Mustang Park Subdivision

Mustang Park is a residential subdivision in Carrollton, Texas, that was developed in phases. On April 19, 2013, JBGL Mustang, LLC (the Declarant) filed in

the county deed records a "Declaration of Covenants, Conditions and Restrictions for Mustang Park Phase Five."

In November 2013, Mustang Park Phase Six was annexed to the subdivision; JBGL filed a "Supplemental Declaration of Covenants, Conditions and Restrictions for Mustang Park Phase Six," making Phase Six subject to the Declaration. The Phase Six Plat identifies a lot 4X (also labeled on another page as Lot 4X Block A) and includes the following sentences, under the title, "HOME OWNER'S ASSOCIATION NOTES": (1) "All open space and screening walls shall be owned and maintained by the . . . Association" and (2) "All 'X' lots shall be considered open space lots." Directly underneath the last sentence, the plat states, "Lot 4X Block A shall be dedicated to the City of Carrollton and maintained by the" Association. No other X lots are located on this plat.

In December 2014, Mustang Park Phase Nine was added to the subdivision; it includes the addition of a lot identified as "LOT 2X BLOCK A OPEN SPACE TO BE DEDICATED TO THE CITY OF CARROLLTON AND TO BE MAINTAINED BY THE" Association. The Phase Nine Plat includes the same open-space ownership and maintenance language as the Phase Six Plat underneath the title "HOME OWNER'S ASSOCIATION NOTES." The only other X lot noted on the plat is immediately adjacent to lot 2X and is identified as "LOT 1X BLOCK A OPEN SPACE TO BE DEDICATED TO AND MAINTAINED BY THE" Association.

3

Lots 2X and 4X abut one another and together constitute an area known as the Greenbelt, which is a subdivision Common Area according to the Declaration's definition.[1] The Greenbelt has a drainage system that was installed by JBGL. The drainage system includes a swale that runs along the backside of the subdivision lots that abut the Greenbelt. Rainwater flows from the Greenbelt via the drainage system into the swale. Within the same area of the Greenbelt—about ten feet from the backyards of the abutting homeowners' lots—a sidewalk/walking trail runs along its length, parallel to the homeowners' lots.

According to the Declaration, the Association manages Mustang Park and is responsible for maintaining its Common Areas. As authorized by the Declaration, the Association's Board of Directors engaged Legacy to serve as the Association's property manager.

## B. The Lawsuit

Lumley owns a residential lot in Mustang Park Phase Six that backs up to the Greenbelt. The Greenbelt's drainage system diverts rainwater to the swale that abuts Lumley's yard. As water moves through the swale, it can overflow a wall that separates the back portion of Lumley's lot from the swale and the Greenbelt. After a heavy rainstorm, Lumley's yard floods from the water and, consequently, has at times become inhabited by crawfish and mosquitos. The flooding often results in ankle-

---

[1]Despite being named "LOT 2X" and "LOT 4X" on the plat, the Greenbelt—as a Common Area under the Declaration—is excluded from the Declaration's definition of "Lot."

deep, standing water that does not recede for several days. The overflowing water and resulting pooling interferes with Lumley's and his family's use and enjoyment of his yard and has damaged his lawn, plants, and soil.

On numerous occasions, Lumley asked Appellants to address the Greenbelt's drainage problem. From May 2018 to the time he filed this lawsuit in 2020, Lumley reached out to Appellants approximately sixty to seventy times to complain about the flooding and request that Appellants correct the drainage problem. At first, Appellants, having previously maintained the Greenbelt for years, informed Lumley that under the Declaration, they were responsible for the maintenance of the Greenbelt and the drainage system. Appellants attempted, on at least two occasions, to implement solutions to correct the drainage issue, but those solutions failed.

Lumley eventually sued Appellants[2] for breach of contract and declaratory relief, among other causes of action.[3] Lumley asserted in his petition that Appellants "materially breached the [Declaration] by . . . failing to fix, repair, or reinstall a faulty drain located within the Common Area"; "continued to refuse to maintain or take proficient corrective action on the drain behind [Lumley's] home"; and refused "to assess or accept responsibility for" the Greenbelt. For breach of the Declaration, he

---

[2]Lumley also sued JBGL, but he nonsuited those claims.

[3]Lumley included additional claims for negligence, gross negligence, negligent misrepresentation, civil conspiracy, actual fraud, and intentional infliction of emotional distress, on which the trial court eventually declined to grant relief. He further sought an accounting and temporary and permanent injunctive relief, which the trial court denied.

5

sought specific performance, damages, and attorney's fees. Lumley sought declarations that the Association "is responsible for the maintenance and upkeep of the" Greenbelt as well as "the repair, upkeep, re-installation, and ensuring the full functionality of the drain located" on the Greenbelt.

In the midst of the suit—on March 4, 2021—JBGL conveyed the Greenbelt to the City of Carrollton by special warranty deed.

## C. The Judgment

Following a bench trial, the trial court rendered judgment for Lumley on his breach-of-contract and declaratory-judgment claims:

• The trial court awarded Lumley breach-of-contract damages from Appellants, jointly and severally, in the amount of $18,950.

• The trial court ordered Appellants to

(1) "repair" Lumley's "black-barred fence . . . to it[]s original condition" and do the same for the part of the black-barred fence located on Lumley's neighbor's property (Lumley's neighbor was not a party to the suit),

(2) "repair" the drainage system on lot 4X according to certain specifications,[4]

---

[4]Those specifications are as follows:

a. Runoff compounding along Lot 59 through Lot 48 created and eroded steeper side slopes. Curb integration between side slopes and the sidewalk;

b. Greenbelt drainage currently converges and empties into the backyard of Lots 44 and 45. Installation of a subsurface drainage system to capture [G]reenbelt runoff to effectively reduce erosion, confine

(3) "pay all expenses, goods, equipment, and labor necessary for the installation of a new, properly functioning drain . . . on [l]ot 4X, as well as all stone surrounding [Lumley's] property . . . necessary to ensure proper drainage . . . to avoid flooding of [Lumley's] property," and

(4) "repair and make ongoing additional repairs to the drainage system located within the common areas and [l]ot 4x in the future to ensure that there is not a drainage or flooding problem that affects [Lumley's] property."

• The trial court rendered declaratory judgments that the Association "is legally responsible for the maintenance and upkeep of . . . [l]ot 4x . . . behind [Lumley's] property . . . due to [its] being a Common Area" and that the Association "is legally responsible for the repair, upkeep, re-installation, and ensuring the full functionality of the drain located on [l]ot 4x."

• And the trial court awarded Lumley $75,006.67 in attorney's fees from Appellants, plus an additional $50,000 in conditional appellate attorney's fees.

Upon request, the trial court filed findings of fact and conclusions of law and then amended findings and conclusions.

---

drainage into well-defined boundaries, and eliminate overflows onto Lots 44 and Lot 45;

c. Approximately four 24-inch drains, 1,500 linear feet of 12-inch pipe, and other material and all labor required to install a subsurface drainage system beneath the [G]reenbelt;

d. Installation of a brick retaining wall (approximately 200 square feet) offsetting the property boundary of Lots 42 through 44 to absolve erosion of steep side slopes in that arena;

e. A subsurface system interconnecting downspouts while spanning the side and backyards of Lots 44 and Lot 45 to eradicate surface drainage and erosion. A subsurface drainage system to capture Greenbelt drainage must be implemented for effective lot drainage.

7

## II. Issues on Appeal

We quote the six issues in Appellants' brief:

(1) The Trial Court erred in finding Legacy liable for any of the damages, as Lumley presented no contractual or other relationship to Legacy, including agency, under which to establish liability.

(2) The Trial Court erred in finding in favor of Lumley as the Declaration, the contract under which Lumley was seeking enforcement[,] specifically states (1) the Association is only responsible to *maintain* the Common Areas; (2) "in no event shall . . . the Association be liable to maintain, repair or restore any grading or drainage on or serving any Lot"; and (3) the Association [as the Declarant's successor or assign], shall not be liable "for any loss of, or damage done to, any shrubbery, grass, flowers, improvements, fences, sidewalks, driveways, or buildings of any type or the contents thereof on any Lot caused by any water levels, rising waters or drainage waters."

(3) The Trial Court erred in ordering a declaration under the Declaratory Judgment[s] Act as (1) there was no justiciable controversy as to the rights and status of the parties; and (2) the judgment rendered simply addressed whether the Association breached the Declaration.

(4) The Trial Court erred in finding in favor of Lumley in the amount of $18,950.00 as (1) there is no liability pursuant to the Declaration and (2) no evidence was presented for an award in this amount.

(5) The Trial Court's judgment is insufficient, as [it] fails to "sufficiently define . . . and protect the rights of the litigants," as the Association is unable to ascertain what "properly functioning drain," "ensure proper drainage," and "ensure that there is not a drainage or flooding problem" requires to satisfy the judgment[.]

(6) As there was no liability under the Declaration, Lumley was not entitled to attorney fees, and thus, the Trial Court erred in awarding Lumley $75,006.67 in attorney fees.

## III. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings.[5] *Id.*

We may review conclusions of law to determine their correctness based upon the facts, but we will not reverse because of an erroneous conclusion if the trial court rendered the proper judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *City of Forest Hill v. Benson*, 555 S.W.3d 284, 289 (Tex. App.—Fort Worth 2018, no pet.). That is, because a trial court's conclusions of law are not binding on us, we will not reverse a trial court's judgment based on an incorrect conclusion of law when the controlling findings of fact support the judgment on a correct legal theory. *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 127 (Tex. App.—Fort Worth 2016, no pet.);

---

[5]Here, Appellants bring legal-sufficiency challenges. We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

*Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679 (Tex. App.—Fort Worth 2015, no pet.).

## IV. Legacy Not Liable for Contract Breach or Declaratory Judgment

In their first issue, Appellants assert that there is no evidence that Legacy—who is not a party to the Declaration—can be liable to Lumley—a homeowner—for the Declaration's breach or for a declaratory judgment construing the Declaration. The Declaration provides that "[t]he [Association's] Board may, at its sole dis[c]retion, enter into contracts with third parties to oversee the operation and management of the Association." Although no one disputes that Legacy was so engaged—Lumley alleges in his live pleading that Legacy was the Association's agent for purposes of the Declaration—no evidence was presented about the nature of Legacy's contract with the Board or the extent to which Legacy might have accepted responsibility or liability for the Association's Declaration-related obligations. Although Lumley argues that Appellants have waived this issue by failing to challenge a specific fact-finding, Appellants' challenge is a no-evidence challenge to conclusion of law number 2[6]—that

---

[6]Lumley also inexplicably argues that this challenge "attempts to flip the burden on appeal" from Appellants to him. But Lumley, as the plaintiff, was required to prove contract liability at trial; thus, we adhere to the well-established no-evidence standard of review in considering this issue. *See Blue Sky Satellite Sales & Theater Servs., LLC v. K18th, LLC*, No. 14-22-00774-CV, 2023 WL 8431244, at *2 (Tex. App.—Houston [14th Dist.] Dec. 5, 2023, no pet.) (mem. op.) ("In a breach of contract action, the plaintiff has the burden to prove that the defendant has obligated himself under the contract; the defendant's denial of this element does not constitute an affirmative defense under Rule 92."); *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 912 (Tex. App.—Dallas 2008, no pet.) ("Privity is an essential element for recovery in

10

both the Association *and Legacy* "have the duty and sole responsibility to properly and adequately maintain the Greenbelt and Drainage System"—which as to Legacy is not supported by any finding of fact.

"As a general rule, a suit for breach of contract may not be maintained against a person who is not a party to the contract . . . ." *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 205 (Tex. App.—El Paso 2017, no pet.) (quoting *Bernard Johnson, Inc. v. Cont'l Constructors, Inc.*, 630 S.W.2d 365, 369 (Tex. App.—Austin 1982, writ ref'd n.r.e.)); *see Mission Grove, L.P. v. Hall*, 503 S.W.3d 546, 552 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (describing as axiomatic principle "that a contract between other parties cannot create an obligation or duty on a non-contracting party, which non-contracting party was a stranger to the basic, underlying construction contract"). Thus, "[t]he right to relief for a violation of a restrictive covenant exists only against persons bound by the covenant or restriction." 16 Tex. Jur. 3d Covenants, Conditions, and Restrictions § 160 (2013).[7]

In his second amended petition, Lumley described Legacy as the Association's agent and pleaded that the Association was liable to him for its agent's acts and

---

any action based on contract; a breach of contract action normally requires privity between the injured party and the party sought to be held liable.").

[7]The Declaration provides that its covenants and restrictions "run with and bind the Property, shall be binding on all Owners[,] and shall inure to the benefit of and be enforceable by Declarant, the Association, the legal representatives thereof, and their successors and assigns." Legacy is not a property owner bound by the Declaration.

omissions "within the scope of the actual, implied, and/or apparent authority of such person on behalf of" the Association.[8] But an agent is not personally liable on contracts made for a disclosed principal in the absence of an express agreement to be so bound.[9] *Neel v. Tenet HealthSystem Hosps. Dall., Inc.*, 378 S.W.3d 597, 605 (Tex. App.—Dallas 2012, pet. denied); *Nagle v. Duncan*, 570 S.W.2d 116, 117 (Tex. App.—Houston [1st Dist.] 1978, writ dism'd).

Lumley argues on appeal that the evidence shows that Legacy agreed to be bound by the Declaration and that the following findings of fact support the conclusion that Legacy is liable according to the Declaration:

> • "Pursuant to Article VI, Section 6.01(a)(v) of the Declaration, the Association engaged Legacy . . . to serve as the Association's property management company";
>
> • "Defendants [defined as the Association and Legacy] informed Mr. Lumley that under the Declaration, they are responsible for the maintenance of the Drainage System, the Greenbelt and the drainage waters from the Greenbelt."

Citing *All Metals Fabricating, Inc. v. Ramer Concrete, Inc.*, 338 S.W.3d 557, 560–61 (Tex. App.—El Paso 2009, no pet.), and *National Casualty Co. v. Lane Express, Inc.*, 998

---

[8]Appellants filed answers with general denials of liability. And at trial, Appellants' counsel told the court in his opening statement, "Now, . . . the management company at all times, as the evidence will show, was an agent for the Association. Anything the management company did or didn't do was at the direction of the Association."

[9]The trial court's amended findings of fact include findings that "Lumley failed to establish the [Association] is liable for agency" and that "Lumley failed to establish Legacy is liable for agency."

S.W.2d 256, 262 (Tex. App.—Dallas 1999, pet. denied), Lumley argues that these findings support a conclusion that Legacy agreed to be bound by the Declaration's provisions vis á vis the subdivision's homeowners. *All Metals* involved a subcontractor who had agreed in writing to be bound by the agreement between the owner and general contractor, which was expressly incorporated by reference into the subcontractor's agreement. No such evidence exists here; no contract between the Association and Legacy was entered into evidence. And *National* supports the conclusion that, absent evidence that Legacy agreed to be liable to owners under the Declaration, it was not. The fact that the Association contracted *with Legacy* to perform the Association's maintenance obligations is not sufficient proof that Legacy agreed to be bound to the individual homeowners under the Declaration. *Cf. Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 610 (Tex. 2004) (describing operation of pass-through claims for construction-contract litigation, which are necessary because the owner and subcontractor have no privity of contract and therefore cannot sue one another).

Accordingly, we hold that no evidence supports the trial court's conclusion that Legacy was liable for breach of the Declaration.

For the same reason, Lumley could not obtain declaratory relief against Legacy; as a stranger to the Declaration, Legacy had no legally cognizable interest in the outcome of the Declaration's interpretation; thus, no justiciable controversy existed as to Lumley and Legacy. *See Savannah Ct. P'ship v. Strait*, No. 02-23-00200-CV, 2024 WL

482227, at *5–8 (Tex. App.—Fort Worth Feb. 8, 2024, no pet.) (mem. op.) (holding that no justiciable controversy existed as to declaratory-judgment action when defendant had sold affected property and thereafter had no legally cognizable interest in outcome of declaratory relief at the time of trial).

We sustain Appellants' first issue.

## V. Scope of Association's Liability for Failure to Maintain as Defined by Declaration

In the appeal's second issue, the Association[10] challenges the trial court's finding and conclusion that it is liable to Lumley for breach of the Declaration. The trial court found that Appellants' "failure to properly and adequately maintain the Greenbelt and the Drainage System is the sole cause of the water that flows from the Greenbelt onto the Property, as well as the resulting pooling of that water on the Property." The Association contends that the trial court's liability and damages findings are based on a misinterpretation of the meaning of *maintain* as used in the Declaration.

### A. Applicable Law

We construe restrictive covenants de novo, applying general rules of contract construction. *Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 696 (Tex. App.—Fort Worth 2018, pet. denied) (citing *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998)). Our primary task is to determine the drafter's intent from the

---

[10]Hereafter, we will refer to the complaints as being brought solely by the Association.

14

instrument's language. *Id.* In doing so, we must examine the covenant as a whole in light of the circumstances present when the covenant was made, *id.* at 697, and endeavor to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

Words used in a restrictive covenant must be given their commonly accepted meanings and may not be enlarged, extended, stretched, or changed by construction. *Severs*, 559 S.W.3d at 697. A restrictive covenant that can be given a definite legal meaning is unambiguous and should be construed liberally to effectuate its intent. *Id.* The interpretation of an unambiguous contract is a question of law for the court. *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021). Only when a restrictive covenant may reasonably be interpreted in more than one way is it ambiguous. *Severs*, 559 S.W.3d at 696.

When a trial court's findings of fact and conclusions of law show the trial court's judgment was based on an incorrect construction of a contract and interpretation of the law, we cannot infer a finding of intent to support the judgment. *See Nautilus Ins. v. Steinberg*, 316 S.W.3d 752, 756 (Tex. App.—Dallas 2010, pet. denied); *Jones v. Smith*, 291 S.W.3d 549, 553 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

**B. Association's Responsibility to Maintain Greenbelt**

The Association first argues that the Declaration did not obligate it to maintain the Greenbelt until JBGL—the Declarant—expressly conveyed that property to the City in March 2021. JBGL's intent regarding the Greenbelt is expressed in Article III of the Declaration, as well as the plats for Phases Six and Nine.

Article III of the Declaration reads as follows[11]:

ARTICLE III

COMMON AMENITIES AND EASEMENTS

**3.01 Obligation of Declarant.** Declarant has installed and constructed, or caused to be installed and constructed, or will install and construct, various improvements and infrastructure to be dedicated and/or conveyed to the City or the Association as determined by Declarant in such condition as required by the City in order to obtain approval of the Plat. *Upon completion of all Common Amenities and Common Areas <u>and</u> dedication <u>or</u> conveyance of the same to the City or the Association, Declarant shall have no further obligation whatsoever to* construct any improvements on the Property or *maintain any of same*, or otherwise fund or be liable for any matters concerning such improvements or otherwise related to the Subdivision.

**3.02 Responsibilities of the Association for Maintenance of the Common Amenities and Easement Areas; Maintenance Reserve Fund.** *Upon dedication or conveyance by Declarant to the Association, the Association shall, and has the sole responsibility to, maintain* (a) the Common Amenities (including any Amenity Center and the Retention Pond), *Common Areas* and any Easement Areas and associated improvements and Common Amenities thereon, and (b) any of the off-site Easement Areas outside the limits of the Subdivision which are or may become necessary or desirable in the future on any Easement Areas for the

_____

[11]Throughout this opinion, we quote entire articles and sections of the Declaration to show the context of the relevant provisions in light of the larger whole.

16

benefit of any present or future improvements and Common Amenities for the benefit of the Subdivision. The Association's costs of maintaining the Common Amenities and such Easement Areas will be collected from the Owners through Assessments as provided in **Article V** hereof. *The Association shall not seek, by either act or omission, to abandon the Association's obligations as established by this Declaration to maintain the Common Amenities* and/or any Easement Areas. In order to provide for extraordinary and unanticipated items regarding the maintenance obligations contained herein, prior to the transfer of control of the Board by Declarant to non-Declarant Owners, the Association shall establish a maintenance reserve fund for the maintenance of the Common Amenities and Easement Areas in an amount the Board shall, in its sole and absolute discretion, determine to be sufficient, but which shall in no case be less than the equivalent of one-sixth (1/6) of the then current Regular Assessment multiplied by all Lots within the Plat.

   **3.03 Association's Easement for Maintenance.** Declarant prior to the establishment of the Association, and thereafter the Association, *shall have a maintenance easement on all Lots* to the extent reasonably necessary for the· purpose of maintaining the Common Amenities and for the removal of any obstruction that may be placed on any Easement Areas that would constitute interference with the Association's use of any such easement, including, without limitation, the Easement Areas established pursuant to **Sections 2.l0(a)** and **3.06** hereof.

[Emphases added.]

The Declaration thus contemplates that either JBGL or the Association will maintain the subdivision's Common Areas, including the Greenbelt. Sections 3.01 and 3.02 simply describe when the Association takes over that maintenance responsibility from JBGL—either upon (a) dedication of the Greenbelt to the City or the Association or (b) conveyance of the Greenbelt to the Association. The Association argues that the dedication of the Greenbelt to the City as shown on the plats "did not occur" until JBGL conveyed ownership of the Greenbelt to the City in March 2021.

17

The Phase Six and Phase Nine Plats recorded in 2013 and 2014, respectively, indicate that lots 4X and 2X "shall be" open spaces owned and maintained by the Association. Property can be dedicated to a homeowners' association by recorded plat. *See Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc.*, 178 S.W.3d 384, 394 (Tex. App.—Fort Worth 2005, pet. denied). And such a dedication is contemplated by Sections 3.01 and 3.02 of the Declaration.[12] Further, the evidence shows that before the date of the deed to the City, the Association did, in fact, accept responsibility for maintaining the Greenbelt, albeit while disputing the scope of that responsibility.

The evidence is sufficient to show that the Association was responsible for maintaining the Greenbelt before the deed conveyance to the City. Thus, the trial court did not err by concluding that Section 3.02 did not bar Lumley's cause of action for breach of contract occurring before March 4, 2021.

## C. Meaning of *maintain*

The Association does not dispute that—after the Greenbelt was conveyed to the City—the Association was required according to the Declaration's language to maintain the Greenbelt, including the drainage system thereon. But the Association

---

[12]Both plats' expression of a present intent for the Association to own and maintain lots 4X and then 2X contrasts with the Phase Nine Plat's forward-looking language that lot 2X is "to be" dedicated to the City. *Cf. Araujo v. Araujo*, 493 S.W.3d 232, 237 (Tex. App.—San Antonio 2016, no pet.) (holding that divorce decree's language that a QDRO was "to be" entered after decree did not evidence a present intent to render a QDRO in the decree).

18

disputes the meaning the trial court placed on the word *maintain*. The Declaration does not define the term; thus, we must look to its ordinarily accepted meaning.

Black's Law Dictionary defines maintain in three applicable ways: "**1.** To continue (something). **2.** To continue in possession of (property, etc.). . . . **4.** To care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." *Maintain*, Black's Law Dictionary (12th ed. 2024). *Maintain* is also defined as "to keep in existence or continuance; [to] preserve; [or to] retain"; "to keep in an existing state (as of repair, efficiency, or validity)[; or to] preserve from failure or decline." *Ladner v. Prop. Owners Ass'n of Mountain Lakes Ranch, Inc.*, No. 07-21-00210-CV, 2023 WL 424846, at *4 (Tex. App.—Amarillo 2023, no pet.) (mem. op.) (first citing *Owasso ISD No. I-011 v. Falvo*, 534 U.S. 426, 433, 122 S. Ct. 934, 939 (2002); and then citing Merriam-Webster's Collegiate Dictionary (11th ed. 2014)); *see also Bartlett v. Bartlett*, 465 S.W.3d 745, 756 & n.8 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (Frost, J., concurring) ("The ordinary meaning of the word 'maintain' is 'to prevent a decline, lapse or cessation from existing state or condition.'" (citing Black's Law Dictionary 953 (6th ed. 1990))). "Thus, maintenance contemplates routine action to keep something operational or in a specified state," as opposed to "repair," which is defined as "to restore by replacing a part or putting together what is torn or broken." *Ladner*, 2023 WL 424846, at *4. However, from these definitions, maintenance might sometimes include repair necessary for restoration to the original state; in other words, maintenance applies to preservation of something's original

19

condition or restoration to its original condition, not to causing it to do something it hasn't done before.[13] *See id.* Notably, although in some places the Declaration uses the terms *repair*, *restore*, and *replacement*, it does so in addition to—and not in lieu of—the word *maintain*; nonetheless, it uses only the word *maintain* to describe the Association's duty as to the Common Areas.[14]

Lumley argues that this court's decision in *Lindemann Properties, Ltd. v. Campbell*, 524 S.W.3d 873 (Tex. App.—Fort Worth 2017, pet. denied) (op. on reh'g), stands for the proposition that *maintain* also means replace. But in that case, this court construed easement language to determine whether the right to "maintain" a radio tower gave the easement grantee the right to use the easement to replace the radio tower. *Id.* at 881. Not only was a different type of agreement at issue, but also construing *maintain* to exclude replacement in that case would have frustrated the very purpose of the agreement. *See id.* at 881–84. We conclude that the right to maintain as construed in *Lindemann* does not inform the Association's duty to maintain as used in the Declaration.

---

[13]The Declaration expressly disclaims JBGL's liability for "damages . . . in connection with *any* construction, design, engineering[,] or defect associated with *any* improvement (or otherwise) constructed on" subdivision property. [Emphasis added.]

[14]This is in contrast to the easement *right* given to the Association within five feet of the "shared property line of each Lot . . . for the purpose of access, ingress, egress, as is reasonably necessary to maintain, repair and/or restore the grading and/or drainage improvements serving the Lots and/or the [s]ubdivision." Thus, contrary to the Association's assertions in its briefing, the Greenbelt is not an Easement Area as defined by the Declaration.

With the proper definition of *maintain* in mind, we consider whether the evidence at trial supports the trial court's liability conclusions.

## D. Evidence About Greenbelt's Drainage System

### 1. Lumley's Expert's Testimony

Lumley's expert testified that water runs within the Greenbelt—both lots 2X and 4X—"and concentrates along the backside of the residential lots, mainly past the hillside." It starts to accumulate around Lot 50 and is "directed toward 42," but it "gets hung up between 44 [Lumley's property] and 45 because there's a drop inlet where its purpose is to accept water, but the velocity discharges are too high for that water to go into that drop inlet." As water accumulates in the swale, "you get erosion that is reflected in debris along the sidewalk, broken down vegetation, and then the accumulation of debris along [the] backside of these residential lots." The drop inlet between Lots 44 and 45 "that was purposed . . . is really not effective because the velocity of discharge is flowing right across it." The existing drop inlet is too small, and the water going over it moves too fast to deflect it into the pipe. In the expert's words, "the way it's constructed right now, it's not working. So there has to be some type of modification for it to be effective, to accept the drainage." He agreed that the problem is either a design issue or construction issue.

When asked why the drainage onto Lumley's property was occurring, the expert stated, "[T]here was a swale that was purposed along the backside of these

properties, and th[at] swale is not large enough to convey that water without over topping the wall."[15] Additionally,

> [T]here's no vegetation that would dissipate erosive velocities, so we have erosion that accumulates around that drop inlet. And then . . . to try to assist that drop inlet, there [were] rocks and a grate put in the drop to slow down water, and that reduces the flow of water.
>
> It's just like traffic. If you were in a traffic jam and slowing down, that water is going to pile up like the vehicles would behind you. So that piling up of water also leads to flowing between lots 44 and 45.

However, he acknowledged that "it's difficult to grow vegetation there because the trees are blocking the sunlight."

According to the expert, the "leak in drainage" was not from Lumley's property.

Pointing to a photograph of Lumley's property, the expert identified "a retaining wall that was constructed during the development" that "holds the fence" but that "also confines the water." He also confirmed that pavers were later put in place, he assumed, "to assist drainage, to help [the water] from topping over." But he did not know who placed the pavers there or when. According to the expert, on the one hand, the pavers caused overflow between Lumley's lot and his neighbor's adjacent lot: "[T]he velocity discharge hits this rock riffraff. It slows down, and it piles up. Some of it goes down the drain, but ultimately, it gets constricted by debris. And then it will flow into their lots." When water flows into those lots, there is a "resin

---

[15]He later agreed that his conclusion that the swale was not large enough was "speculative."

velocity that causes dissipation of dirt transferred into [Lumley's] lot." But when asked whether the gaps between the pavers increased or decreased the drainage onto Lumley's lot, he answered, "It doesn't help. It just allows water to go through those areas. It's not going to act as a barricade as the retaining wall would."

When asked why the sides of Lumley's yard were so muddy, the expert opined, "[B]ecause water flows through there. So it's an accumulation from his gutters, which he seems to have known because he's got some protective measures in place. But there's a large amount of volume coming from the backside of [the] lot." He acknowledged that some of the water in Lumley's yard comes from his gutters. But he also acknowledged that with respect to the water, "It's compounding effects." According to the expert, "[t]he main thing" needed to protect Lumley's property from water damage was "just keeping the water out of his yard."

The expert opined that what was needed to "adequately maintain[16] the drainage on [Lumley's] property," was "to collect the water at a different area where it doesn't generate the velocities that would cause erosion and capture it away from those residential lots, and that would require additional inlets and piping and grading." This solution included (1) "creat[ing] a curb to protect th[e] side slopes";

---

[16]Lumley argues that this testimony is proof supporting a more expansive definition of the word *maintain* as used in the Declaration and that the Association failed to adequately challenge the trial court's finding of fact based on this testimony. But Lumley's expert did not testify as a legal or contract expert on the proper construction of what the Declaration meant in using the word *maintain*. Absent ambiguity, the proper construction of this word is a question of law that we determine de novo. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

(2) "dispers[ing] drop inlets throughout the lot and collecting them locally"; (3) transporting water collected through those inlets "through a pipe that would then connect [to the] existing piping system"; and (4) flattening the steep slopes[17] to help prevent erosion. He also stated that maintenance should include taking care of the vegetation.

When asked whether his proposed remedies would be "adequate for the [Association] to adequately maintain the drainage system in the common areas," the expert replied, "Yes. I believe that it would. It would not only protect . . . Lumley, but it would protect his neighbors. And ultimately, there might be a deeper look and opportunity to correct other things, simplify the system." On cross-examination, however, he answered "No" when asked whether these solutions were guaranteed to fix the problem.

The expert saw the erosion along the retaining wall as the main problem but opined that the rate of erosion depended on the particular rainfall event. He agreed that the "issues . . . don't occur every time it rains; they occur when there's a big storm." The expert also gave the conclusory opinion that, "when you see erosion, that is a maintenance issue, that is an identifier that something needs to be maintained."

---

[17]It is unclear if the expert was referring to the slopes on Lumley's property, other subdivision lots, the Greenbelt, or some combination thereof.

24

When asked about the nature of his proposed solution to the drainage and erosion problems, the expert stated, "It's a structural design." He agreed that the "issue" was with "the original design of the drainage facilities."

**2. Expert's Report**

The August 20, 2021 expert report was admitted into evidence and was based on an August 4, 2021 inspection. Lumley provided the expert with videos showing the flooding into his backyard; although they were dated October 8, 2018; June 1, 2019; March 13, 2020; and November 1, 2020, Lumley told the expert that "these were not the only times flooding [had] occurred." The expert described the videos as "typical flooding" from Lumley's backyard.

The report notes that

> Lumley's backyard stores runoff before pouring into the southeast side yard (between Lots 44 . . . and 45). Combined drainage from the backyard, neighboring yard, and roof drainage downspouts eroded vegetation and soil. Concrete splash blocks had been installed beneath downspouts to dissipate flow energy. Sand had been placed in areas to fill the holes, but the issue appears to compound with each subsequent rain event.

Regarding the drain inlet, the report concludes,

> Media confirms drainage from the [G]reenbelt crosses the sidewalk and channels along the back of the properties. The inlet is ineffective during larger quantities of runoff and is prone to clogging. The drainage channel capacity is inadequate to handle flows and needs to be supplemented. However, even with modification, the current configuration would not be effective. Essentially, a depression needs to be constructed around the drain, but it will slow down the drainage, deepening discharge depths and exacerbate[ing] the condition. Deepening the drainage depths would permit overtopping, like observed

25

in the videos, without creating a barrier (raising the wall height). Even if this were rectified, it would not address erosion and maintenance that may always be a problem. Other alternatives are likely more suitable.

According to the report, the stone wall that the Association installed to try to mitigate flow into Lumley's backyard "did not reduce water entering the Lumley lot; rather, it cause[d] the flow to concentrate through the opening left in the wall (behind Lots 44 and 45). Ultimately, drainage still conveys through the Lumley lot and is not a suitable modification."

> Regarding causation, the report concluded,

> Water overtopping [Lumley's] retaining wall is essentially caused by too much water accumulating at that point of the watershed. Site erosion is caused by the accumulation of runoff energy when water is permitted to flow over long distances. Strategically constructing additional collection sites within the watershed will effectively eliminate erosion and discharges behind the Lumley lot. Placing more inlets within the [G]reenbelt (where the most land area is) is logical and could even eradicate post-storm ponding. Extending the existing collection network would require additional excavation and grading activities within the [G]reenbelt.

The report ended with the proposed solutions that the trial court awarded as specific performance for breach of contract.

**3. Lumley's Testimony**

Lumley testified that "the water that floods [his] backyard comes in from a common space that does not stop the water from flowing over the back wall of [his] property." According to Lumley, "when it rains, it pushes soil and debris down into that one drain," which "fills up[ and] is overrun, and the water pours over the back of

26

the wall and floods into [Lumley's] backyard." Lumley opined, "until that drain is opened up and unclogged, I'm doing maintenance for them because my kids can't play in the yard." But Lumley also admitted on cross-examination that by removing the screening grate—something he had done "many times to get the water to get out of [his] backyard"—he had seen grass and debris go into the drain, even though he had been told the grate's purpose was "to filter out large items from going down th[e] drain" and that grass and debris could clog the drain.

Lumley also testified,

Several months before I reached out to you, there was an attempt made to cut down the one inlet, the one drainpipe that is behind mine and [my neighbor's] property. That is the only drainage outlet for water for 15 houses up to the east of me. All of that water that you saw in that video drains to the one outlet.

It eroded all of the soil and filled in the void or cut out a void rather around that dome grate and that pipe. So I don't know if it was the management company or the [Association], they got tired of hearing me gripe probably. They went out there and had someone with a chop saw, and they cut two inches or so off the top of that pipe to make it lower so that the water would keep flowing into it because it eroded around it where there was a lip kind of sticking up.

After that, they made an attempt to put a secondary wall behind my retaining wall that is by my fence. Not realizing what the problem is and that void keeps filling up because the soil just washes off, washes off. And it fills that void.

Well, they put another wall back there, but that wall does nothing. It's actually probably more funneling the drainage, the water, into my neighbor's yard and underneath my fence and cutting the side yard than it is helping.

27

Lumley identified Section 3.02 of the Declaration as the source of the Association's duty. His goal for the suit was "to correct the problem that is flooding my backyard." On cross-examination, Lumley provided some explanation of the relief he was seeking:

> Q. Okay. And aren't the damages that you're seeking at least partly for erosion on your lot?
>
> A. Yes.
>
> Q. Okay.
>
> A. Because of damages done from outside my property which I cannot control.
>
> . . . .
>
> Q. . . . Are you contending that the Association has the duty to *repair and restore grading and drainage* on your lot?
>
> A. On my lot?
>
> Q. Yes, sir.
>
> A. With damage caused from the common area? *Yes*, I do.
>
> Q. Okay. *And are you asserting that the Association has a duty to redesign the original drainage plan?*
>
> A. *If that is what needs to be done.* They have accepted the property. The homeowners are paying for that upkeep.

[Emphases added.]

When asked what improvements needed repair, Lumley testified, "The walking trail, the soil eroding, the fence that is just to the south of my property alongside that

28

easement that is falling over because of the water, the drainage. Putting in more catch basins or whatever the engineering side deems is appropriate so that it's not one basin for 15 houses." In response to the question, "That is not a repair, right? That is not fixing something that is already there. That is adding something new, right?" Lumley answered, "Some of that is adding something new. Some of it is correcting what is there. Some of it is the damage that's done from the erosion. For example, the walking trail, the water is starting to undercut it. And it's going to cost all of the homeowners even more money to fix that. That would be maintenance."

Lumley also testified that several of his neighbors had installed French drains and retaining walls on their properties.[18] But he had not done so, contending that the Association was financially responsible for doing so. Lumley also asked that as part of maintaining and repairing the lot 4X drainage, the Association "repair" the fence located in the Common Area behind his backyard.

**E. Analysis**

According to the plain meaning of *maintain* as used in the Declaration, the Association's responsibility vis á vis the Greenbelt was to keep it in its existing—i.e.,

---

[18]In an email to Legacy, the Association's attorney noted, "In one photograph [of Lumley's property], it appears that . . . Lumley's neighbor has installed a small retaining wall on the common area to help ensure that the surface water does not drain onto his property."

originally designed—state.[19] Most of the evidence was that the flooding into Lumley's backyard was caused by the way the Greenbelt drainage itself was designed. Thus, the trial court erred by ordering the Association to make the following design changes to the Greenbelt and Lumley's property:

- "Curb integration between side slopes and the sidewalk";[20]

- "Installation of a subsurface drainage system to capture [G]reenbelt runoff to effectively reduce erosion, confine drainage into well-defined boundaries, and eliminate overflows onto Lots 44 and Lot 45";

- "Approximately four 24-inch drains, 1,500 linear feet of 12-inch pipe, and other material and all labor required to install a subsurface drainage system beneath the [G]reenbelt";

- "Installation of a brick retaining wall (approximately 200 square feet) offsetting the property boundary of Lots 42 through 44 to absolve erosion of steep side slopes in that arena";

- "A subsurface system interconnecting downspouts while spanning the side and backyards of Lots 44 and Lot 45 to eradicate surface drainage and erosion. A subsurface drainage system to capture Greenbelt drainage must be implemented for effective lot drainage."

- "[P]ay all expenses, goods, equipment, and labor necessary for the installation of a new, properly functioning drain . . . on [l]ot 4X, as well

---

[19]And although the Declaration gives the Association an easement on certain Lots "for installation, maintenance, repair, removal and operation of utilities and drainage facilities," it also provides that the Association "shall not have any obligation to repair any improvements installed in any Easement Areas." That the Declaration gives the Association an easement on owners' Lots for purposes of installation, repair, and removal of improvements in the Common Areas does not enlarge the Association's sole duty only to maintain those areas, including the Greenbelt.

[20]The expert had opined that "a curb to protect th[e] side slopes" would need to be "create[d]" and that the existing steep slopes would need to be "flatten[ed]" to curb erosion.

30

as all stone surrounding [Lumley's] property . . . necessary to ensure proper drainage in the common area to avoid flooding of [Lumley's] property"; and

• "[R]epair and make ongoing additional repairs to the drainage system located within the common areas and [l]ot 4x in the future to ensure that there is not a drainage or flooding problem that affects [Lumley's] property."

The trial court also erred by granting declaratory relief to the effect that the Association "is legally responsible for the repair, . . . re-installation, and ensuring the full functionality of the drain located on [l]ot 4x, the Common Area behind [Lumley's] property."

That the drain itself was not properly designed to handle all of the water flow from the swale during heavy rain does not show that the Association failed to maintain the Greenbelt's originally installed drainage system. However, there is other evidence of a lack of maintenance. Both Lumley and his expert testified that erosion along the swale—particularly the walking-trail part—and some erosion around the drain itself contributed to the backing up of water into Lumley's backyard by allowing the water to move too quickly through the swale and toward the drain. This unmitigated erosion is proof of a lack of maintenance of the original design. Additionally, Lumley testified that he had cleared debris from the drain repeatedly. This is some evidence that the Association failed to address debris accumulating in the Greenbelt, thus contributing to the slow flow of rainwater into the drain. Both Lumley and his expert testified that the water that did not drain quickly enough into

the inlet backed up into his yard; Lumley also provided photographs showing this backup. Accordingly, the evidence supports a conclusion that the Association's failure to address erosion and debris-accumulation issues caused some damages to Lumley's backyard by allowing more water than otherwise would have to flow into his backyard. And other evidence was admitted to support a conclusion that the excess water flow into his backyard also caused soil and vegetation erosion there. Because there is evidence to support the conclusion that the Association failed to maintain the Greenbelt by failing to address erosion, debris-accumulation, and vegetation issues, we review the rest of the Association's arguments related to liability and damages.

**F. No Contractual Limitation of Association's Liability**

The Association contends that even if Lumley proved that its failure to maintain the Greenbelt—as that term is intended in the Declaration—resulted in some damage to Lumley's property, it cannot be liable for that particular damage under Section 2.10 of the Declaration. That section provides as follows:

> **2.10 <u>Drainage</u>.**
>
> (a) All Lots shall be graded so that no storm water drainage shall flow onto other Lots except that storm water drainage may flow to a neutral swale at the side property line at the side of the adjacent Lot provided that the swale shall drain to the street or alley property line. Declarant prior to the establishment of the Association, and thereafter the Association, are hereby granted a perpetual non-exclusive easement over an area five feet (5') on both sides of the shared property line of each Lot within the Subdivision for the purpose of access, ingress, egress, as is reasonably necessary to maintain, repair and/or restore the grading and/or drainage improvements serving the Lots and/or the Subdivision; <u>provided</u>, *however, in no event shall Declarant and/or the*

32

*Association be liable to maintain, repair or restore any grading or drainage on or serving any Lot.*

(b) Each Owner shall be liable and responsible for the maintenance, repair and/or restoration of grading and/or drainage improvements on such Owner's Lot. *Neither Declarant nor Declarant's successors or assigns shall be liable for any loss of, or damage done to, any shrubbery, grass, flowers, improvements, fences, sidewalks, driveways or buildings of any type or the contents thereof on any Lot caused by any water levels, rising waters or drainage waters.*

(c) Unless approved by the Architectural Control Committee, no Owner will: (i) alter the surface water drainage flows of a Lot as originally established at the time of the initial construction of the Residence; or (ii) install landscaping or other improvements that may interfere with, obstruct or divert drainage flows established by Declarant or any approved homebuilder. The foregoing shall not prevent or limit Declarant from performing any grading work and/or changing any surface water drainage flow on any Lot.

[Italics added.]

Although Section 2.10(a) provides that "in no event shall . . . the Association be liable to maintain, repair or restore any grading or drainage *on or serving* any Lot," the evidence shows that the grading and drainage Lumley alleged was not maintained is not "on or serving" a subdivision Lot as defined by the Declaration. The evidence shows that the flow of water into the swale serves the Greenbelt and other property, not Lumley's. Therefore, Section 2.10(a) does not prevent breach-of-contract liability for specific performance or damages caused by the Association's failure to maintain the Greenbelt.

Additionally, the Association urges that it is a successor of JBGL such that Section 2.10(b) affirmatively disclaims the Association's liability "for any loss of, or

33

damage done to, any shrubbery, grass, flowers, improvements, fences, sidewalks, driveways or buildings of any type or the contents thereof on any Lot caused by any water levels, rising waters or drainage waters."

A sister court has explained the ordinary meaning of the phrase "successors and assigns," a phrase that the Declaration does not define:

> The term "successor" in contract law is a term of art. A successor is "one who replaces or follows a predecessor" or "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."
>
> > When applied to corporations, the term
> >
> > 'successor' does not ordinarily connote an assignee, but is normally used in respect to corporate entities, including corporations becoming invested with the rights and assuming the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from another corporation. . . .
>
> The Texas statutory scheme concerning domestic business organizations supports the interpretation of "successor and assigns" language as extending responsibility or liability to an entity that expressly agrees to assume a liability or obligation as part of an asset purchase. Specifically, the Business Organizations Code provides:
>
> > [A] person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity *that is not expressly assumed by the person.*
>
> Thus, the use of the contractual language of "successors and assigns," when connoting assumption of future liability to perform a particular act—such as offering comparable employment—extends to a business entity that makes an express agreement to assume such an obligation as part of an asset purchase.

34

*Tyco Valves & Controls, L.P. v. Colorado*, 365 S.W.3d 750, 773–74 (Tex. App.—Houston [1st Dist.] 2012) (citations omitted) (first quoting *Int'l Ass'n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp.*, 328 S.W.2d 778, 781 (Tex. App.—Houston 1959, no writ); and then quoting Tex. Bus. Orgs. Code Ann. § 10.254(b)), *aff'd*, 432 S.W.3d 885 (Tex. 2014). Such language therefore binds a subsequent entity by merger, conversion, or by express agreement to assume contractual liability. *See id.*

The Association is not a successor to JBGL nor did it assume JBGL's liability as part of an asset purchase; it is a separate entity formed for specific purposes outlined in the Declaration. Thus, according to the ordinary meaning of the phrase, the Association is not included.

Lumley also points out that while Section 2.10(a) expressly disclaims the Declarant's and the Association's liability to repair, maintain, or restore grading or drainage on any Lot, Section 2.10(b) names only the Declarant and its "successors or assigns" as those not responsible for "any loss of, or damage done to, . . . any Lot caused by any water levels, rising waters or drainage waters"—without expressly naming the Association. This further supports the conclusion that Section 2.10(b) intended to employ the ordinary meaning of "successors and assigns" such that "Association" is defined as the Association "or such other name as is selected by Declarant or Declarant's successors."

Moreover, other language in the Declaration supports this reading. Declarant is defined as JBGL "and its successors, and any assignee of Declarant to whom Declarant, by instrument recorded in the Real Property Records of Denton County, Texas, expressly assigns *all of* Declarant's rights and obligations as Declarant under this Declaration." [Emphasis added.] The Association has not succeeded to or been assigned "all of" JBGL's rights and obligations according to the Declaration. Also, in describing Class B voting rights in the Association, the Declaration states, "Declarant (*and Declarant's successors and assigns*, in accordance with the terms hereof), shall be the sole 'Class B Member' (herein so called) so long as Declarant, or any such successor or assign, owns a single Lot or any portion of the Property." [Emphasis added.] Under the Declaration, the Association is not a voting member of itself.

Based on the foregoing, we conclude that the disclaimer of liability in Section 2.10(b) does not apply to the Association and that the trial court did not err by so concluding. Accordingly, we sustain Appellants' second issue in part and overrule it in part.

## VI. Some Contract Damages Unavailable from the Association

The Association contends in its fourth issue that it cannot be liable for damages according to the Declaration; alternatively, it argues that no evidence supports the amount of the trial court's $18,950 damage award for breach of the Declaration.

36

## A. No Limitation of Damages Liability

The Association first contends that Section 7.08 of the Declaration disclaims its liability for damages related to any breach of the Declaration. Section 7.08 of the Declaration is tacked onto the end of Article VII, entitled "Architectural Control Committee." Section 7.08 contains a broad limitation of liability for damages or other relief:

> **7.08 Limitation on Liability.** Declarant, *the Association*, the Board (or any of its members) and the Architectural Control Committee (or any of its members), *shall not*, individually or in combination, *be liable in damages (or otherwise) to any Owner for any act or occurrence, or any failure to act, relating to this Declaration*, including any claims by any Owner regarding or arising out of any subjective decisions, mistakes in judgment, negligence or nonfeasance arising out of, or in connection with, the approval or disapproval or failure to approve or to disapprove any Plans submitted, or for otherwise acting in good faith in such capacities. Declarant and the Architectural Control Committee (or any of its members) shall not, individually or in combination, be liable in damages (or otherwise) in connection with any construction, design, engineering or defect associated with any improvement (or otherwise) constructed on the Property. . . .

[Emphases added.] This section immediately follows the section describing the consequences of an owner's failing to obtain proper approval for "[t]he construction, repair, replacement, installation[,] or placement of any Residence, Structure[,] or improvement of any type on a Lot."

But Section 9.05 of the Declaration, entitled Enforcement, provides that a Lot owner may "enforce the [Declaration's] covenants and restrictions . . . by any proceedings at law or in equity against *any Person* violating or attempting to violate any

37

part of this Declaration, . . . to restrain or enjoin violations thereof, *to recover damages*[,] or to seek such other relief available pursuant to applicable law." [Emphases added.] Because the Declaration defines Person as "any natural person, corporation, partnership, trust or other legal entity," the Association is a Person under Section 9.05. Thus, these two provisions are seemingly in conflict.

Construing Sections 7.08 and 9.05 in light of the entire Declaration—to harmonize and give effect to both—we conclude that the limitation in Section 7.08 applies to alleged acts or failures to act related to the specific duties and obligations of Article VII—review, approval, disapproval, or inaction related to a subdivision homeowner's proposed or completed construction or modification of improvements on a Lot. Accordingly, the trial court did not erroneously conclude that "[t]he Association's affirmative defense of limitation of liability, as provided by Article VII, Section 7.08 of the [Declaration] . . . was not . . . applicable to Lumley's cause of action for breach of contract."

## B. Evidence Supports Only Some of Damages Award

The Association next contends that no evidence supports the amount of the trial court's damages award for breach of the Declaration.

Lumley testified that he had incurred $3,500 for his expert's drainage evaluation; had paid a $4,500 retainer for his expert's testimony at trial but sought to be reimbursed $4,990; had incurred a $450 bill for an engineering evaluation of his home's foundation; and according to his own testimony, had spent $4,000–$5,000

38

attempting to get grass to grow in his yard—by purchasing sod, two aerators, and rakes "and things . . . to clean up the mess in the backyard from the mulch washing over." He also testified that he was seeking $500 "for the actual damages to [his yard's] erosion for all the sod and replacement [he] had to make." The Association complains that no expert bills nor evidence supporting the $500 spent were admitted. But assuming that Lumley can recover his expert-related costs as contract damages— which the Association does not challenge—Lumley's testimony alone is sufficient evidence of his expenditures. *See, e.g.*, *Okumus v. Mouton*, No. 14-18-00220-CV, 2020 WL 6278664, at *4–5 (Tex. App.—Houston [14th Dist.] Oct. 27, 2020, no pet.) (mem. op.); *Canyon Vista Prop. Owners Ass'n, Inc. v. Laubach*, No. 03-11-00404-CV, 2014 WL 411646, at *6 (Tex. App.—Austin Jan. 31, 2014, no pet.) (mem. op.). Adding these up but excluding the $490 in additional expert fees (which Lumley requested but did not explain or testify that he had paid)—and using the low end of what Lumley testified he had paid to grow grass in his yard—we calculate $12,950 in damages that is supported by Lumley's testimony.

Lumley also testified that he had received "certain bids for drainage on the side of [his] yard"—he *thought* "the sum total of those was *somewhere around* $20,000 for the side yard and the back" and included

> [r]eplacing sod, primarily, and elevation, just making sure that anything that was compacted was put back up, replanting grass, worked in weeds and pack soil, having to pull in soil and drainage, assuming that there's going to be a time period when there's not going to be or that there is

going to be work being done behind here that it's going to need to divert water temporarily.

[Emphasis added.] But this testimony was too vague and conclusory to support value amounts for the different types of work included. *Cf. Tuttle v. Builes*, 572 S.W.3d 344, 356–58 (Tex. App.—Eastland 2019, no pet.) (holding tenant's testimony about monthly rental-value amount was conclusory—and therefore legally insufficient to support damages award—when tenant provided no facts to support how he calculated the total); *Lefton v. Griffith*, 136 S.W.3d 271, 277 (Tex. App.—San Antonio 2004, no pet.) (holding owner's value evidence—that inventory she had to sell for $10,000 was actually worth $300,000—conclusory because no evidence showed the type or amount of furniture sold).

We conclude that the evidence is legally sufficient to support only $12,950 in damages. We sustain the Association's fourth issue in part.

If part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial on liability and damages. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) ("[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment."); *Golden Corral Corp. v. Noble Austin Apartments L.L.C.*, No. 03-19-00463-CV, 2021 WL 2878565, at *11 (Tex. App.—Austin July 9, 2021, no pet.) (mem.

40

op.). Therefore, we will suggest a remittitur of $6,000. *See* Tex. R. App. P. 46.3; *Werner Co. v. DeVallee*, No. 02-19-00043-CV, 2021 WL 1134387, at *18 (Tex. App.—Fort Worth Mar. 25, 2021, pet. denied) (mem. op.).

## VII. Declaratory Judgments

In its third issue, the Association contends that Lumley was not entitled to declaratory relief because the trial court's declarations merely addressed the same issues as the breach of contract action and that therefore there was no justiciable controversy between the parties.

The Uniform Declaratory Judgments Act (UDJA) provides that "[a] person interested under a deed, will, written contract, or other writings constituting a contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). The UDJA's purpose is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Id.* § 37.002(b). "A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). The UDJA does not grant courts the authority to render advisory opinions, *see Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998), nor does it permit courts to grant

declaratory relief when the real issue is determining whether a party breached an agreement, *see Bonham State Bank*, 907 S.W.2d at 467.

In his second amended petition, Lumley requested declaratory relief "with respect to the . . . breach of the . . . Declaration[] . . . and the Texas Property Code involving the upkeep and maintenance of common areas allocated to" the Association. Although in its brief the Association misidentifies the part of the judgment containing the declaratory relief, its argument clearly challenges the granting of any declaratory relief at all. Nevertheless, we conclude that the remaining declaratory relief—although confirming the Association's legal duty under the Declaration, which was also an element of the contract-breach action—was not improper for lack of a justiciable controversy, nor was it improper because it duplicated an issue in the breach-of-contract action.

The Texas Supreme Court has held that "the existence of another adequate remedy does not bar the right to maintain an action for declaratory judgment" and that "prohibiting declaratory judgments whenever a breach of contract claim is available would negate the [UDJA's] explicit terms covering such claims." *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009) (first quoting *Cobb v. Harrington*, 190 S.W.2d 709, 714 (Tex. 1945); and then citing Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a)–(b)). The Association does not challenge the propriety of the declaratory relief as it relates to the attorney's fees award, which is a separate issue. *See MBM Fin. Corp.*, 292 S.W.3d at 669.

The scope and nature of the Association's legal obligation vis á vis the Greenbelt was at the center of the dispute between Lumley and the Association. The Association filed an answer in which it expressly raised the argument that it had no responsibility to maintain the Greenbelt unless and until expressly conveyed to it by JBGL. Thus, we conclude that a justiciable controversy existed so as to allow the trial court to grant the surviving declaratory relief.

We overrule the Association's third issue as it pertains to the remaining declaratory relief.

## VIII. Attorney's Fees Awards

Because we have determined that the trial court erred by awarding the specific-performance relief for breach of contract and part of the declaratory relief, attorney's fees must be recalculated as to the Association only. *See Hicks Airfield Pilots Ass'n v. Hicks Asset Partners, LLC*, No. 02-22-00291-CV, 2023 WL 4007353, at *6 (Tex. App.—Fort Worth June 15, 2023, no pet.) (mem. op.); *Britton v. Laughlin*, No. 02-20-00226-CV, 2021 WL 5227169, at *3 (Tex. App.—Fort Worth Nov. 10, 2021, pet. denied) (mem. op. on reh'g).[21]

---

[21]When asked by the trial court whether he was "attributing the lion's share" of attorney's fees to the Association, Lumley's counsel stated, "The [Association], no. The [Association], the management company and JBGL . . . when I could not properly segregate those and they were for the same claims."

## IX. Conclusion

We reverse the trial court's judgment in part as delineated below.

## A. Legacy

Having sustained Appellants' first issue, we reverse the part of the judgment holding Legacy jointly and severally liable with the Association for the breach of contract damages and attorney's fees, and we render a take-nothing judgment as to Legacy. *See* Tex. R. App. P. 43.2(c).

## B. The Association

Having sustained the Association's second issue in part, we vacate the following paragraphs of the trial court's judgment and render a take-nothing judgment with respect to the specific-performance relief awarded:

> IT IS FURTHER ORDERED by the Court that Defendant, Mustang Park Owner's Association, Inc., LLC, shall repair the drainage system located on Lot 4x pursuant the below requirements which shall be listed within the scope of work:
>
> a. Runoff compounding along Lot 59 through Lot 48 created and eroded steeper side slopes. Curb integration between side slopes and the sidewalk;
>
> b. Greenbelt drainage currently converges and empties into the backyard of Lots 44 and 45. Installation of a subsurface drainage system to capture greenbelt runoff to effectively reduce erosion, confine drainage into well-defined boundaries, and eliminate overflows onto Lots 44 and Lot 45;
>
> c. Approximately four 24-inch drains, 1,500 linear feet of 12-inch pipe, and other material and all labor required to install a subsurface drainage system beneath the greenbelt;

d. Installation of a brick retaining wall (approximately 200 square feet) offsetting the property boundary of Lots 42 through 44 to absolve erosion of steep side slopes in that arena;

e. A subsurface system interconnecting downspouts while spanning the side and backyards of Lots 44 and Lot 45 to eradicate surface drainage and erosion. A subsurface drainage system to capture Greenbelt drainage must be implemented for effective lot drainage.

IT IS FURTHER ORDERED, ADJUDGED and DECREED by the Court that Defendant, Mustang Park Owner's Assocition [sic], Inc., shall pay all expenses, goods, equipment, and labor necessary for the installation of a new, properly functioning drain in the common area behind Plaintiff's property located at [home address redacted] on Lot 4x, as well as all stone surrounding Plaintiff's property located at [home address redacted] necessary to ensure proper drainage in the common area to avoid flooding of Plaintiff's property located at [home address redacted].

IT IS FURTHER ORDERED, ADJUDGED and DECREED by the Court that Defendant, Mustang Park Owner's Assocition [sic], Inc., shall repair and make ongoing additional repairs to the drainage system located within the common areas and Lot 4x in the future to ensure that there is not a drainage or flooding problem that affects Plaintiff's property located at [home address redacted].

We also vacate most of the trial court's second declaration as follows: "Mustang Park Owner's Association, Inc. is legally responsible for the repair, . . . re-installation, and ensuring the full functionality of the drain located on Lot 4x, the Common Area behind Plaintiff's property . . . ."[22]

---

[22]Because we are vacating those parts of the judgment that reference the phrases "properly functioning drain"; "necessary to ensure proper drainage"; and "ensure that there is not a drainage or flooding problem," we have not addressed the Association's fifth issue alleging that the inclusion of those phrases in the judgment fails to accord it the requisite finality and certainty. *See* Tex. R. App. P. 47.1.

But having affirmed Lumley's third issue as to the remaining declaratory relief, we modify the judgment so that the declaratory relief reads as follows:

THE COURT FURTHER JUDICIALLY DECLARES that:

a. Mustang Park Owner's Association, Inc is legally responsible for the maintenance and upkeep of the field (Lot 4x) behind Plaintiff's property located at [home address redacted] due to the field being a Common Area; and

b. Mustang Park Owner's Association, Inc. is legally responsible for the upkeep of the drain located on Lot 4x, the Common Area behind Plaintiff's property located at [home address redacted].

According to Texas Rule of Appellate Procedure 46.3, as to the Association only, we suggest a remittitur of $6,000. *See* Tex. R. App. P. 46.3. If Lumley files a remittitur within twenty days from the date of our judgment and notifies this court of such, we will reform the trial court's damages award to $12,950 and affirm that part of the judgment as modified; further vacate and modify the judgment as indicated above and affirm those parts as modified; and reverse the attorney's fees award and remand the case solely for a recalculation of those fees as to the Association only. If a remittitur is not timely filed, we will reverse the judgment as to the breach-of-contract claim and attorney's fees only, vacate and modify the judgment as indicated above, and remand the case for a new trial solely on the breach-of-contract claim and attorney's fees as to the Association only.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered:  August 22, 2024